UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| WILLIAM SHORT HORN,<br><br>    Plaintiff,<br><br> vs.<br><br>NANCY A. BERRYHILL,[1] Acting Commissioner, Social Security Administration,<br><br>    Defendant. | CIV. 16-5067-JLV<br><br>ORDER |

**INTRODUCTION**

Plaintiff William Short Horn filed a complaint appealing the final decision of Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration, finding him not disabled. (Docket 1). Defendant denies plaintiff is entitled to benefits. (Docket 7). The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF"). (Docket 9). The parties filed their JSMF. (Docket 10). The parties also filed a joint statement of disputed facts ("JSDF").[2] (Docket 10-1). For the reasons stated

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 20, 2017. Pursuant to Fed. R. Civ. P. 25(d), Ms. Berryhill is automatically substituted for Carolyn W. Colvin as the defendant in all pending social security cases. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The court finds a majority of the JSDF are not accurate statements of the administrative record and will not be referenced in this order.

below, plaintiff's motion to reverse the decision of the Commissioner (Docket 13) is granted.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 10) is incorporated by reference. Further recitation of salient facts is incorporated in the discussion section of this order.

On July 28, 2009, Mr. Short Horn filed an application for supplemental social security income ("SSI") benefits under Title XVI, alleging an onset of disability date of April 25, 2009.[3] (Docket 10 ¶¶ 4 & 11). On June 12, 2015, the ALJ issued a decision finding Mr. Short Horn was not disabled. Id. ¶¶ 8 & 116; see also Administrative Record at pp. 20-34 (hereinafter "AR at p. ___"). The Appeals Council denied Mr. Short Horn's request for review and affirmed the ALJ's decision. (Docket 10 ¶ 8). The ALJ's decision constitutes the final decision of the Commissioner of the Social Security Administration. It is from this decision which Mr. Short Horn timely appeals.

The issue before the court is whether the ALJ's decision of June 12, 2015, that Mr. Short Horn was not "under a disability within the meaning of the Social Security Act since July 28, 2009, the date the application was filed [through June 12, 2015]" is supported by substantial evidence in the record as a whole. (AR at p. 21); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if

---

[3]Mr. Short Horn previously applied for benefits in March 2007. (Docket 10 ¶ 1).

supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580. The court reviews the Commissioner's decision to determine if an error of law was committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). A

reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act. See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to SSI benefits under Title XVI. 20 CFR § 416.920(a).[4] If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled. Id. The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998). The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations. (AR at pp. 21-22).

---

[4]The criteria under 20 CFR § 416.920 are the same under 20 CFR § 404.1520. Boyd v. Sullivan, 960 F.2d 733, 735 (8th Cir. 1992).

**DISCUSSION**

Plaintiff challenges the ALJ's decision on a number of grounds.  The issues posed by him are:

1. Whether Mr. Short Horn's bilateral knee impairments met the criteria of Listing 1.02;[5]

2. Whether the ALJ's assessment of opinion testimony was in accord with the legal standard and the substantial evidence in the record;

3. Whether the ALJ's assessment of Mr. Short Horn's credibility was in accord with the legal standard and the substantial evidence in the record;

4. Whether the ALJ's assessment of residual function capacity was in accord with the legal standard and the substantial evidence in the record; and

5. Whether the ALJ's decision at step five was in accord with the legal standard and the substantial evidence in the record.

(Docket 12 at p. 7).  Plaintiff's challenges to the ALJ's decision will be addressed as necessary.

1. **Whether Mr. Short Horn's bilateral knee impairments met the criteria of Listing 1.02**

At step two, the ALJ found Mr. Short Horn had the following severe impairments: "bilateral knee disorder, blindness in the right eye, and bilateral elbow disorder."  (Docket 10 ¶ 110).  At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1

---

[5] 20 CFR Part 404, Subpart P, Appendix 1, Listing 1.00.

("Appendix 1").  20 CFR §§ 404.1520(d), 404.1525, and 404.1526.  If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, the claimant is considered disabled.  At that point the Commissioner "acknowledges [the impairment or combination of impairments] are so severe as to preclude substantial gainful activity. . . . [and] the claimant is conclusively presumed to be disabled."  Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

The ALJ determined Mr. Short Horn did not have an impairment or combination of impairments which met or were medically equal to one of the impairments listed in Appendix 1.  (Docket 10 ¶ 111).  The ALJ indicated he considered Mr. Short Horn's impairments individually and in combination, but no treating or examining physician found equivalent severity to any listed impairment.  Id.

Mr. Short Horn objects to the ALJ's step three conclusion.  (Docket 12 at pp. 7-16).  He argues the ALJ's "failure to consider Listing 1.02—when evidence in the record met or equaled Listing 1.02 criteria—and to state reviewable reasons for his step three determination, deprives the reviewing court of any way to ascertain on this record whether the ALJ"s denial of Mr. Short Horn's claim at step three was supported by substantial evidence."  Id. at p. 16.

The Commissioner counters that Mr. Short Horn "failed to satisfy his burden of proving that he met Listing 1.02."  (Docket 14 at p. 4).  The

6

Commissioner argues that "[t]o meet a listing, an impairment must meet all of the listing's specified criteria. . . . [And] Plaintiff has failed to prove he was unable to ambulate effectively. . . . Objective medical evidence also fails to support Plaintiff's claim he was unable to ambulate effectively for a continuous 12 months."[6]  Id. at pp. 4-5 & 7.  Finally, the Commissioner submits that "while the ALJ did not explicitly discuss a specific listing at step three, Plaintiff failed to show this was a harmful error . . . ."  Id. at p. 9.

By the Listing a "[m]ajor dysfunction of a joint" is

Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) *and* chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), *and* findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

Appendix 1, Listing 1.02 (emphasis added).  In addition to these three criteria, the Listing also requires that there be "[i]nvolvement of one major peripheral weight-bearing joint (i.e., . . . knee . . . ), resulting in the inability to ambulate effectively, as defined in 1.00B2b."  Id. at Listing 1.02A.

"Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity

---

[6]It is unclear from the Commissioner's brief if the only contested issue at step three is effective ambulation.  (Docket 14 at pp. 4-10).  For this reason, the court is compelled to address all aspects of Listing 1.02.

7

functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Id. at Listing 1.02B2b(1). While the list is not intended to be exhaustive, included as examples of ineffective ambulation are the following:

> [T]he inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Id. at Listing 1.00(B)(2)(b)(2).

As part of the evaluation of a claimant's inability to ambulate effectively, the ALJ is required to consider "[p]ain [as] an important factor contributing to functional loss." Id. at Listing 1.00(B)(2)(d). "In order for pain . . . to be found to affect an individual's ability to perform basic work activities, medical signs . . . must show the existence of a medically determinable impairment(s) that could reasonably be expected to produce the pain . . . . The musculoskeletal listings that include pain or other symptoms among their criteria also include criteria for limitations in functioning as a result of the listed impairment, including limitations caused by pain." Id. The ALJ is reminded "[i]t is . . . important to evaluate the intensity and persistence of such pain . . . carefully in order to determine [its] impact on the individual's functioning under these listings." Id.

"The inability to ambulate effectively . . . must have lasted, or be expected to last, for at least 12 months. For the purposes of these criteria, consideration of the ability to perform these activities must be from a physical standpoint alone." Id. at Listing 1.00(B)(2)(a). "Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation." Id. at Listing 1.00(D). The Listing encourages the use of medical records over a significant period of time. "[A] longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment unless the claim can be decided favorably on the basis of the current evidence." Id. at Listing 1.00(H)(1). A claimant's response to pain medication is an important part of the longitudinal record. "[A] pain medication may relieve an individual's pain completely, partially, or not at all. . . . Therefore, each case must be considered on an individual basis, and include consideration of the effects of treatment on the individual's ability to function." Id. at Listing 1.00(I)(2). "A specific description of the drugs or treatment given (including surgery), dosage, frequency of administration, and a description of the complications or response to treatment should be obtained. . . . As such, the finding regarding the impact of treatment must be based on a sufficient period of treatment to permit proper consideration or judgment about future functioning." Id. at Listing 1.00(I)(3).

The medical examination of a claimant who uses a hand-held assistive device requires consideration of the following:

> When an individual with an impairment involving a lower extremity or extremities uses a hand-held assistive device, such as a cane, crutch or walker, examination should be with and without the use of the assistive device unless contraindicated by the medical judgment of a physician who has treated or examined the individual. The individual's ability to ambulate with and without the device provides information as to whether, or the extent to which, the individual is able to ambulate without assistance. The medical basis for the use of any assistive device (e.g., instability, weakness) should be documented. The requirement to use a hand-held assistive device may also impact on the individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling.

Id. at Listing 1.00(J)(4).

The ALJ is instructed to "determine whether an individual can ambulate effectively . . . based on the medical and other evidence in the case record, generally without developing additional evidence about the individual's ability to perform the specific activities listed as examples in 1.00B2b(2) . . . ." Id. "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school." Id. at Listing 1.00(B)(2)(b)(2).

In summary, the Listing requires the ALJ to determine whether all four of the following criteria are present:

1. A gross anatomical deformity;

2. Chronic joint pain and stiffness with signs of limitation of motion;

3. Medical imaging of joint space narrowing, bony destruction or anklyosis; and

4. An inability to ambulate effectively.

Id. at Listing 1.02 and 1.02(A). If all four criteria are satisfied, the claimant is "presumed to be disabled." Bowen, 482 U.S. at 141. If all four criteria are not satisfied, the ALJ is required to continue to step four of the evaluation process. Baker, 159 F.3d at 1143-44.

In 2008, Mr. Short Horn's medical record began to show the presence of knee issues. On physical examination his right knee had a "positive Lachman's" test[7] and a "probable anterior cruciate tear."[8] (Docket 10 ¶ 33).

In April 2010, Dr. Wessel, as a consultative physician, reviewed x-rays of both knees and performed a physical examination. Id. ¶ 36. Multiple x-rays of the right knee disclosed:

> [S]evere degenerative arthritis throughout the tibial plateau, as well as the femoral condyles. There is osteophyte formation, very significant articular surface degenerative changes, and considerable joint space abnormality. There is also noted to be calcifications of the suprapatellar tendon, two calcium circumferential abnormalities of that. The posterior patella is quite rough with spurs in the superior and inferior aspects.

---

[7]"The Lachman test is the most reliable clinical test for diagnosing rupture of the anterior cruciate ligament . . . . Rupture of the ACL leads to increased anterior tibial translation coupled with tibial internal rotation." (Docket 12 at p. 9 n.10 (internal citation omitted).

[8]An April 2015 MRI confirmed that "the posterior cruciate ligament was buckled and the anterior cruciate ligament fibers appeared torn." (Docket 10 ¶ 102).

Id. ¶ 41. The assessment for the right knee was "severe degenerative arthritis."

Id. ¶ 42. X-rays of the left knee disclosed:

> [S]evere degenerative changes throughout the tibial plateau. The medial condyle and the distal femur are very much involved with large osteophyte formation, very rough articular surfaces, both medial and lateral, with joint-space abnormalities. There appears to be some calcium irregularities to the infrapatellar tendon and/or anterior joint space near the medial epicondyle, likely osteophyte formation.

Id. The assessment for the left knee was "severe degenerative arthritis changes." Id. ¶ 43.

On physical examination, Dr. Wessel reported that the right knee exhibited tenderness, a positive drawer sign,[9] and ligamentous instability. Id. ¶ 37. The left knee exhibited "grit and popping with flexion and extension," and a positive drawer sign. Id. "Dr. Wessel assessed severe degenerative arthritis bilateral knees with evidence of some internal ligamentous abnormality . . . ." Id. ¶ 38.

In x-rays taken of Mr. Short Horn's right knee in June 2010, a radiologist noted:

> "[P]eaking" of the left lateral tubercle, decreased height of the medial joint compartment, hypertrophic osteophyte formation of corners of the femur and corners of the tibia and the junction of the femoral condyle and distal metaphysis. Hypertrophic osteophytes involved the patella. . . . Two large calcific bodies were in the soft tissues anterior to the distal femoral diaphysis, and two more were in the

---

[9]The drawer test involves "[t]he forward or backward sliding of the tibia under applied stress, which indicates laxity or tear of the anterior (forward slide) or posterior (backward slide) cruciate ligament." (Docket 12 at p. 10 n.12) (internal citation omitted).

> region of the posterior knee joint. . . . Diagnosis: Moderate degenerative osteoarthritis, degenerative cartilaginous disease involving medial joint compartment, minimal chondromalacia of the patella, effusion, and the large calcific bodies in the soft tissues.

Id. ¶ 45. The radiologist reported there was no change from x-rays taken in May 2008.[10] Id.

The next month, following an orthopedic referral to the Indian Health Service ("IHS") hospital in Pine Ridge, Dr. Alexander Hesquijarosa performed an orthopedic examination of Mr. Short Horn. Id. ¶¶ 46-47. During the examination, the doctor "observed a thin male with antalgic gait, with severe osteoarthritis with bulky knees and minimal palpable joint space bilaterally." Id. ¶ 47. Dr. Hesquijarosa charted "anterior-posterior severe degenerative joint disease" and recommended bilateral knee replacements. Id. IHS denied a referral for bilateral knee replacement surgery.[11] (Docket 10 ¶ 66).

MRIs of both knees were taken in April 2015. Id. ¶ 102. The left knee abnormalities included those previously disclosed in April 2010. Id. Additionally, "the posterior cruciate ligament was buckled and the anterior cruciate ligament fibers appeared torn. . . . Bone bruising was present in the tibial plateau." Id. The right knee MRI disclosed "a joint effusion in the patellofemoral joint space, signal consistent with bone bruising, signs of tears of

---

[10]The May 2008 x-rays are not in the administrative record.

[11]The court takes judicial notice of the fact that IHS is habitually underfunded by Congress. As a result, IHS denies funding of contract services for non-life threatening conditions of Native Americans on the Pine Ridge Indian Reservation.

13

the lateral menisci, the previously seen calcific bodies in the joint and posterior to the joint, and buckling of the posterior cruciate ligament. . . . He had an 'intrasubstance tear,' anterior cruciate ligament tear, multiple areas of bone bruising, and the four loose calcific bodies." Id. ¶ 103.

The ALJ concluded at step three that "[n]o treating or examining physician has identified findings equivalent in severity to the criteria of any listed impairment." (AR at p. 23). That statement is in error based on the analysis of the record above. Dr. Wessel, Dr. Hesquijarosa and Dr. Livermont all unequivocally diagnosed Mr. Short Horn as suffering from bilateral knee conditions which exhibit a "gross anatomical deformity," with "medical imaging" confirming "joint space narrowing, bony destruction or anklyosis." Appendix 1 at Listing 1.02. These findings satisfy subpart 1 and 3 of the Listing. Id.

Beginning with Dr. Wessel's examination in 2010 through IHS Dr. Livermont's treatment of Mr. Short Horn, the medical records are replete with references to Mr. Short Horn's chronic pain associated with his bilateral knee conditions. See Docket 10 ¶¶ 36, 47, 50-54, 56-61, 64-68, 71-76, 78, 81, 84, 86, 88-91, 93 & 96-101.

Physical conditions such as those experienced by Mr. Short Horn and the variations in his pain levels are conditions commonly known to wax and wane. It is not unexpected for an individual with these conditions to appear and act healthy when the medications seem to be working, while at other times to suffer from the extreme, debilitating problems these physical conditions cause. Mr.

Short Horn's various levels of pain over this extended period of time are well "established by a record of ongoing management and evaluation." Appendix 1 at Listing 1.00(D). See also Nowling v. Colvin, 813 F.3d 1110, 1123 (8th Cir. 2016) ("the ALJ improperly accorded great weight to [those] statements . . . indicating that Nowling demonstrated 'improvement' without acknowledging that Nowling's symptoms waxed and waned throughout the substantial period of treatment [and] without acknowledging the unpredictable and sporadic nature of Nowling's symptoms . . . .").

The medical record constitutes a "longitudinal clinical record" disclosing "the assessment of [the] severity and expected duration" of Mr. Short Horn's impairments. Appendix 1 at Listing 1.00(H)(1). Nothing in Listing 1.00 requires that Mr. Short Horn's pain be debilitating at all times, rather only that it be chronic pain which lasts "for at least 12 months." Id. at Listing 1.00(B)(2)(a). The record confirms Mr. Short Horn suffers "chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints," satisfying subpart 2 of the Listing. Id. at Listing 1.02.

The only remaining question at step three is whether Mr. Short Horn suffered an "inability to ambulate effectively." Id. at Listing 1.02A. The Commissioner argues the answer to this issue must be "no," because "Listing 1.02 . . . requires the inability to walk without the use of an assistive device that requires the use of both hands, such as a walker." (Docket 14 at p. 5). Mr. Short Horn counters the Commissioner incorrectly states the requirement for the

15

analysis of ineffective ambulation. (Docket 15 at p. 2). Mr. Short Horn contends "Listing 1.00B provides for alternative ways to show ineffective ambulation." Id.

Listing 1.00(B) does not require a finding that a claimant is unable to walk without the use of an assistive device, such as a walker or crutches, necessarily involving the use of both hands to qualify at step three. That circumstance is merely one of several non-exclusive examples suggested in the Listing. See Appendix 1 at Listing 1.00(B)(2) ("examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes . . . ."). Other examples of ineffective ambulation include:

1. [T]he inability to walk a block at a reasonable pace on rough or uneven surfaces;

2. [T]he inability to use standard public transportation;

3. [T]he inability to carry out routine ambulatory activities, such as banking and shopping; and

4. [T]he inability to climb a few steps at a reasonable pace with the use of a single hand rail.

Id. An "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment . . . that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id. at Listing 1.00(B)(1).

Mr. Short Horn acknowledged he walked the two and one-half blocks from his home to the Kyle IHS Clinic. (Docket 10 ¶ 28). However, that walk

16

required him to stop at the halfway point, approximately 1.25 blocks, and rest at the Kyle convenience store. Id. The ALJ noted this activity as "he would stop at a convenience store at the halfway point to say hi to others and then continue walking to the clinic." (AR at p. 24).

The ALJ's finding is an unfair characterization of the record. First, the parties agree that Mr. Short Horn needed to rest at the convenience store, as opposed to simply stopping there to visit. (Docket 10 ¶ 28). Second, in a functional report of August 2010, Mr. Short Horn stated that he did not walk to the clinic alone, but rather someone had to accompany him. (AR at p. 373; see also Docket 10 ¶ 21). This statement was confirmed by his mother, Myrnette Short Horn, who wrote that her son "did not go out alone because '[h]is knees give out on him.'" (Docket 10 ¶ 16). She observed when he walked even short distances of 50 to 100 yards he needed to rest for 20 to 30 minutes before proceeding. Id. ¶ 17. By Mr. Short Horn's own account, when he did walk up to two blocks, he had to rest for 10 minutes before being able to walk farther. Id. ¶ 21.

Having the ability to walk 1 or 2 blocks, but then requiring 10 to 30 minutes of recovery time is not consistent with the ability to walk at a "reasonable pace." Appendix at Listing 1.00(B)(2). Judged against the requirement that a claimant "must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living," the substantial evidence in the record compels a finding Mr. Short Horn

17

is not able "[t]o ambulate effectively." Id. Mr. Short Horn's inability to walk "interferes very seriously with [his] ability to independently initiate, sustain, or complete activities." Id. at Listing 1.00(B)(1).

Mr. Short Horn carried his burden of proof at step three. Bowen, supra. The ALJ erred in fact and as a matter of law. Smith, 982 F.2d at 311. The court finds Mr. Short Horn qualified at step three because his impairments, bilateral knee disorders, met the criteria of Listing 1.02 of Appendix 1.

"The reason for [the] difference between the listings' level of severity and the statutory standard is that . . . the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." Sullivan v. Zebley, 493 U.S. 521, 532 (1990). "If the claimant has an impairment that meets the medical criteria of a listed impairment, the claimant is presumptively disabled, and no further inquiry is necessary." Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003). See also Bowen, 482 U.S. at 141. Mr. Short Horn is disabled and entitled to benefits. 20 CFR §§ 404.1520(a)(4)(iii) and 404.1520(d).

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 409(g). If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate." Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992). Remand to the Commissioner for another hearing is neither necessary nor appropriate in this case. Mr. Short Horn is disabled and

18

entitled to benefits. Reversal is the appropriate remedy at this juncture. Thompson, supra.

## ORDER

In accord with the above decision, it is

ORDERED that plaintiff's motion (Docket 13) is granted and the decision of the Commissioner of June 12, 2015, is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to the plaintiff William Short Horn.

Dated September 26, 2017.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE